**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**BRUCE A. LIEBERMAN, et al.,**

       **Plaintiffs,**

       **vs.**                            **Civ. No. 21-238  JFR/SCY**

**THE PENN MUTUAL LIFE INSUR. CO.,**

       **Defendant.**

**ORDER GRANTING DEFENDANT'S MOTION**
**FOR JUDGMENT ON THE PLEADINGS AND FOR DISMISSAL**

This matter comes before the Court on Defendant The Penn Mutual Life Insurance Company's ("Penn Mutual") Motion For Judgment On The Pleadings filed May 28, 2021. Doc. 21. Plaintiffs responded on June 10, 2021 (Doc. 22), and Defendant replied on June 23, 2021 (Doc. 26). Defendant seeks a summary dismissal of the amended complaint (Doc. 16) on three grounds: (1) Plaintiff Deborah E. Lieberman lacks the capacity to sue because she is not an "owner" of the life insurance policies at issue here and thus has no rights or damages; (2) the statutes of limitations on all claims have expired because they accrued when the parties commenced their contracts in 2011 and 2012; and (3) the express terms of the life insurance policies preclude Plaintiffs' common law and statutory claims because the only allegations Plaintiffs make are explicitly anticipated by and permitted under the insurance policy contracts, and Plaintiffs fail to allege, nor could they allege, that any breach of the contracts occurred.

Because the Court finds that the express terms of the life insurance policies preclude each of Plaintiffs' claims, it has only considered that substantive argument, which is dispositive. The Court **GRANTS** Defendant's motion for judgment on the pleadings based on operation of the express terms of the life insurance policies as set forth below.

There are two life insurance policies in dispute.  The first policy insures the life of Plaintiff Mr. Bruce A. Lieberman (Mr. Lieberman), with the primary beneficiary his spouse, Plaintiff Mrs. Deborah E. Lieberman (Mrs. Lieberman).  Doc. 16 ¶ 5 (Am. Compl.).  The second policy insures the life of Mrs. Lieberman, and it names Mr. Lieberman as the primary beneficiary.  *Id*. ¶ 6.

In their Complaint, Plaintiffs seek (1) a mandatory injunction to reinstate their life insurance policies to the full duration of coverage, and (2) reformation to require notice to them before any reduction to the duration of the life insurance policies occurs in the future.  They also seek costs, attorney's fees, and punitive damages.  Plaintiffs allege three counts against Defendant:  (I) unfair and/or deceptive acts/practices in violation of the New Mexico Unfair Insurance Practices Act ("UIPA"), N.M. Stat. Ann. § 59A-16-3, 4A and 4G (1978); (II) unfair and/or deceptive practices in violation of the New Mexico Unfair Practices Act ("UPA"), N.M. Stat. Ann. § 57-12-3 (1978); and (III) breach of the implied covenant of good faith and fair dealing.  *See* Doc. 16 (Am. Compl.).

The Court resolves the implied covenant of good faith and fair dealing claim first, and then addresses the statutory unfair trade practice claims.

## I.    Relevant Background Facts

In ruling on a motion for judgment on the pleadings under Rule 12(c), the Court must accept as true all facts alleged in the complaint.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002) ("We use the same standard when evaluating 12(b)(6) and 12(c) motions.").  It also must view these factual allegations in the light most favorable to the plaintiff.  *See Twombly*, 550 U.S. at 555.

Viewing the facts alleged in the amended complaint in this manner, the amended complaint establishes the following:

On January 7, 2011, Plaintiffs purchased from Penn Mutual a Flexible Premium Adjustable Life Insurance Policy.  The named insured is Mr. Lieberman, and the primary beneficiary is Mrs. Lieberman.  Doc. 16 ¶ 5; *see* Doc. 9-1 (hereinafter "Mr. Lieberman's Policy").  On September 1, 2012, Plaintiffs purchased a nearly identical policy naming Mrs. Lieberman as the insured and Mr. Lieberman as the beneficiary.  Doc. 16. ¶ 6; *see* Doc. 9-2 (hereinafter "Mrs. Lieberman's Policy").  Other than the amount of the death benefit, duration of coverage, initial premium and computations arising therefrom, the provisions of both policies are identical.  *Id*.  Mr. Lieberman's annual premium is approximately $8754, with a maturity value of $500,000.  Doc. 9-1 at 3.  Mrs. Lieberman's annual premium is roughly $5196, with a maturity value of $350,000.  Doc. 9-2 at 3.  The parties agree that the policies are essentially the same for purposes of the current motion, and, therefore, the Court will not distinguish them, unless specifically relevant as stated herein.[1]  *Id*.

Defendant does not clearly admit that a reduction to Plaintiffs' duration of coverage occurred here, but Penn Mutual's arguments assume that it has, and this Court will do the same.[2]  Plaintiffs suggest that Defendant has *either* reduced their duration of coverage, *or* that Defendant at least maintains it may do so without notice to Plaintiffs and/or without a chance for Plaintiffs to cure such a material change to their life insurance policies.[3]  Doc. 16 ¶ 24.  On January 24,

---

[1] All citations to Doc. 9-1, Mr. Lieberman's Policy, therefore, apply equally to Doc. 9-2, Mrs. Lieberman's Policy.

[2] The closest Defendant comes to agreeing that Plaintiffs' duration of coverage was reduced is the following statement:  "To the extent there has been some duration reduction, and that duration reduction was due to the payment of reduced premiums over several years, such a reduction is consistent with the Policies' language."  Doc. 21 at 5.

[3] The amended complaint states:  "To this day, Plaintiffs do not know the amount of years the durations of coverage of the Policies have purportedly been reduced or when those purported reductions occurred."  Doc. 16 ¶ 15.

2018, Plaintiffs received a letter from Penn Mutual (that is not attached to the amended complaint) confirming that as long as there were sufficient funds in the **Cash Surrender Value** of the Policies, a reduction in the payment of the annual premium would not adversely affect the Policies' death benefit coverage. Doc. 16 ¶ 7. The letter stated that "***changes to the scheduled premium payment would impact future cash value and the duration of coverage of the Policies***," but Plaintiffs maintain that Penn Mutual has never implied or suggested that it could reduce the Policies' duration of coverage *without notice* to Plaintiffs, including notice of the purported number of years Defendant intended to reduce the duration of coverage. *Id*. ¶ 8.

Plaintiffs inadvertently learned during a telephone call with Defendant on an unrelated topic in 2019 "that Defendant had, without any notice to Plaintiffs, reduced the duration of coverage of the Policies for the years in which Plaintiffs had only paid the Policies' costs of insurance." *Id*. ¶ 11. Plaintiffs maintain they could not and did not discover that a reduction in coverage occurred until that accidental disclosure during the 2019 telephone conversation. *Id*. ¶¶ 17-18.

Plaintiffs admit that they knew their failure to pay the full premium amount annually *could* impact their Policies, but they never knew that Defendant *could unilaterally* reduce their duration of coverage without notice or the opportunity to cure. *Id*. ¶ 11; Doc. 22 at 4-5 ("Of course Plaintiffs knew" that a reduction in the amount of the premium paid would reduce the duration of coverage.). Plaintiffs concede a "buried" provision on page 15 of the Policies (Section 12), entitled "General Provisions," addresses Defendant's ability to reduce the duration of coverage if an insured pays less than the initial premium amount (Doc. 16 ¶ 12), but Plaintiffs contend it would be unreasonable and unconscionable to expect an insured to find this concealed reference after a policy issues (*id*. ¶¶ 13, 15).

4

The relevant duration of coverage provision states as follows:

> **Duration of Coverage** - ***The duration of coverage under this policy will depend on the amount, timing and frequency of premium payments***; changes in the Specified Amount or benefits; the interest rates credited or investment return; the cost of insurance rates charged; percent of premium charge; expenses charges; surrenders, and the amount and timing of any partial surrenders or policy loans.

Doc. 9-1 at 17 (emphasis added).

Plaintiffs allege they do not actually know how much their Policies were reduced in coverage years, nor when any such reduction took place. Doc. 16 ¶ 15. Yet, they believe their duration of coverage was reduced because in 2019 Penn Mutual told them it was reduced for the years in which Plaintiffs had only paid the Policies' cost of insurance; neither party specifies when a reduction occurred, nor how much of a reduction took place. *Id.* ¶ 11, 15; Doc. 22 at 12.

## II.     The Parties' Arguments

### A. *Defendant's Reliance on the Express Policy Terms as Grounds for Dismissal*

Defendant contends that Plaintiffs' claims fail because they complain only about policy terms and results that are anticipated, included, and expressly addressed within the four corners of the contracts. Defendant calls this a case of buyers' remorse resulting from the Policies' express terms, and Penn Mutual asks the Court to reject Plaintiffs' efforts to reform the contracts ten years after-the-fact. Doc. 21 at 1. Defendant raises one primary argument to support dismissal of all three counts as a matter of law, namely that the express policy terms bar Plaintiffs' recovery. Penn Mutual also asserts an additional substantive basis as a specific ground for dismissing each count; those three independent arguments are summarized separately below.

As to the express policy terms barring all three counts, Penn Mutual contends that because the Policies are clear that Plaintiffs' "Duration of Coverage" is contingent on  specific

factors, and those factors were not met here, Plaintiffs' claims must be dismissed.  The most

relevant policy language at issue in this dispute, as stated *supra* and bears repeating provides:

***"The duration of coverage under this policy will depend on the amount, timing and frequency***

***of premium payments*** . . . ."  Doc. 21 at 2-3 (citing Doc. 9-1 at 17) (emphasis added).  Defendant

explains that the Policies are called "Flexible Premium Adjustable" Policies because the

insured/owner gets to decide what to pay toward the premium.  *Id*. at 3.  Premiums get credited

to a Policy Value that can earn interest, receive dividends, and be borrowed against by the policy

owner.  *See* Doc. 9-1 at 8, 11-13.

Defendant contends that Plaintiffs were in the driver's seat as to how their Policies would

operate.  Doc. 21 at 5-6 ("it is the payor Mr. Lieberman's actions –not Penn Mutual's—with

respect to premium payments that may cause a policy to lapse.").  If an owner chooses to pay

less in premiums, it logically impacts the duration of coverage under the Policies' express terms.

Doc. 21 at 3.  "And to the extent Plaintiffs desire to *extend* the duration of coverage, they need

only *pay more* premiums into the Policies."  *Id*. at 5 (emphasis added).  If a reduction in duration

did occur here, Defendant maintains it was consistent with the Policies' terms, and regardless of

any reduction, no lapse in coverage has occurred, nor is any lapse alleged.  Doc. 21 at 5.

The Policies expressly state that a lapse will eventually result if a policy owner reduces or

terminates premium payments.  Doc. 9-1 at 3 ("NOTE: Insurance will terminate if the premiums

paid and the interest credited are insufficient to cover the monthly deductions, except as provided

in Section 4.").  As with any insurance policy, Defendant states that coverage exists only so long

as the policy remains in force.  And how long the policy remains in force is a function of "the

amount, timing and frequency of premium payments," among other factors.  Doc. 21 at 4-5.

Defendant maintains it surely cannot be a surprise to Plaintiffs that the "duration" of a policy

may be shortened due to the amount of and the way in which an insured makes premium payments, especially given the express terms of these Policies.  *Id*. at 5.

Penn Mutual contends the Policies are clear, and that Defendant provided written Illustrations to Plaintiffs at the time of sale to further explain how long the Policies could last. *Id*. (citing Doc. 9-4 at 7-8 [Policy Illustrations]).  To the extent Plaintiffs complain about a reduction in the Policies' Cash Value (Doc. 16 ¶ 16), Defendant offers the Illustration's express language stating that "By paying only the premium required to satisfy the No-Lapse Guarantee the owner may be foregoing the advantage of build up a significant account value."  Doc. 9-4 at 2.  In other words, "the more premiums that are paid, the greater the account value."  Doc. 21 at 6.  According to Defendant, the Illustrations clearly convey that premium payments impact policy values.  *Id*.  Defendant also contends its Policies cannot be unconscionable because they were reviewed and approved by the New Mexico Department of Insurance,[4] and because Plaintiffs had a ten-day preview period.  Doc. 21 at 7-8.

Regarding Defendant's alleged failure to notify Plaintiffs about the reduced duration of the Policies, Defendant cites to the Policies' following, explicit Notice provisions:

> If, on a Monthly Anniversary prior to the Maturity Date shown on Page 3:
>
> (a) the Net Cash Surrender Value is insufficient to cover the Monthly Deduction for the following policy month; and
> (b) the No-Lapse Guarantee Requirement is not met,
>
> then a grace period of 61 days will be allowed for the payment of premium sufficient to keep this policy in force. The payment required is the lesser of the Monthly Deduction or the amount necessary to meet the No-Lapse Guarantee Requirement.

---

[4] Plaintiffs challenge any reliance on the state agency's review of the Policies as procedurally improper, contending such consideration would require converting this motion to one reviewed under rule 56, giving Plaintiffs an opportunity to conduct discovery on that issue.  Doc. 22 at 3.  The Court has not relied on the state's approval of the Policies in its disposition here.

> Notice of the amount of premium sufficient to keep this policy in force will be sent to the last known address of the Owner. The notice will be sent at least 30 days before the end of the 61-day grace period. This policy will remain in force during the grace period.

Doc. 9-1 at 8.

Defendant explains that the required Grace Period has never been triggered; therefore, notice to Plaintiffs has never been required. The only time Penn Mutual must notify a policy holder of the No-Lapse Guarantee Account balance "is if the Policies are in danger of lapsing because the 'Net Cash Surrender Value is insufficient to cover the Monthly Deduction for the following policy month' and 'the No-Lapse Guarantee Account less any outstanding indebtedness' is zero (and thus the "No-Lapse Guarantee" is not met)." Doc. 26 at 3. According to Defendant, "Plaintiffs complain about a lack of notice about something for which notice is not yet required." *Id*. And, if Plaintiffs were worried about the Policies lapsing, there were two policy provisions they could have relied upon:

> **Annual Report**- Each year a report will be sent to the Owner which shows the current policy values, premiums paid and deductions made since the last report, any outstanding policy loans, and any other information required by the Insurance Department of the jurisdiction in which this policy is delivered.
>
> **Projection of Benefits and Values**- *Upon request*, the Company will provide a projection of illustrative future Death Benefits and Policy Values. The request for a projection must be made in writing by the Owner.

Doc. 9-1 at 18 (emphasis added). Defendant concludes that Plaintiffs' failure to allege that they made those requests and/or that Penn Mutual denied providing permitted notices or reports to Plaintiffs bars any claim here that is based on an alleged lack of notice. Doc. 26 at 3.

   B.  *Defendant's Additional Substantive Legal Arguments To Dismiss Each Count*

In addition to the express policy language noted above that Defendant contends renders judgment in its favor on all three counts, Penn Mutual raises additional substantive legal grounds for dismissing each count in the Plaintiffs' amended complaint as a matter of law. First, Defendant

maintains that the implied covenant of good faith and fair dealing cannot exist without Plaintiffs also asserting a breach of contract claim (Doc. 21 at 15), nor can that implied covenant add terms to an existing, written contract as Plaintiffs hope to accomplish here (*id*. at 14).  Second, the UIPA claim must fail because Plaintiffs neglect to allege any actual misrepresentation, but instead allege only that Penn Mutual did exactly as the Policies permit, and that compliance with the Policies' language cannot constitute a "misrepresentation."  Third, the UPA claim fails for the same reasons given with respect to the UIPA claim and because Plaintiffs only take issue with Defendant's alleged conduct in 2018 and 2019, not behavior that occurred when Defendant sold them the Policies in 2011 and 2012; therefore, a UPA claim is not adequately pled.

C.  *Plaintiffs' Arguments in Support of Their Amended Complaint*

Plaintiffs characterize the thrust of their Amended Complaint as Defendant's failure to provide notice about their diminished duration of coverage, and they argue that such failure must be considered and addressed at trial, not resolved through judgment on the pleadings.  Doc. 22 at 2.  They contend that a reduction in the duration of coverage must be preceded by notice and a chance to cure, which Defendant never provided.  Doc. 22 at 5-6.

Plaintiffs maintain that notice about any shortened duration in coverage was required based on common sense and the Policies' express terms.  Doc. 22 at 5.  As to common sense, Plaintiffs contend that any insurer should have to tell an insured that a reduction in duration has occurred or is about to occur.  *Id*.  The express policy terms Plaintiffs rely upon for their required notice contention are the **No-Lapse Guarantee**, the **No-Lapse Guarantee Requirement**, and the **No-Lapse Guarantee Account**.  Doc. 22 at 5-7.

The Policies' **No-Lapse Guarantee** provision states:

This policy will not lapse as a result of a **Net Cash Surrender Value** insufficient to cover the Monthly Deduction for the following month if, on a monthly

anniversary prior to the Maturity Date shown on Page 3, the **No-Lapse Guarantee Requirement** is satisfied.

Doc. 9-1 at 7 (emphasis added).  The **No-Lapse Guarantee Requirement** provides:

> The **No-Lapse Guarantee Requirement** is satisfied if, on a monthly anniversary prior to the Maturity Date shown on Page 3, the **No-Lapse Guarantee Account** less any outstanding indebtedness exceeds zero.
>
> The No-Lapse Guarantee Requirement is not satisfied if the indebtedness is greater than the **Cash Surrender Value**.
>
> Note that the **No-Lapse Guarantee Account**, the No-Lapse Percent of Premium Charge, the No-Lapse COI Charges, and the No-Lapse Interest Rates are not used to determine values and benefits under the policy.  These values are only used to determine whether or not the **No-Lapse Guarantee Requirement** is satisfied.

*Id*. (emphasis added).  The **No-Lapse Guarantee Account** provides that on the Policy Date, "the **No-Lapse Guarantee Account** is the initial premium paid," less the sum of several listed factors.  And, the **No-Lapse Guarantee Account** is the sum of four other specified values, less the sum four additional variables.  *Id*. (emphasis added).

Plaintiffs contend those provisions are simply incomprehensible because they require "far more information than Defendant provides concerning the Policy's duration."  Doc. 22 at 7.  To demonstrate the alleged incomprehensibility, Plaintiffs refer to policy language that expressly states that certain factors "are **not used to determine values and benefits under the policy**." Doc. 9-1 at 7.  Yet, Plaintiffs maintain that Defendant relied on those factors to determine their Policies' values.  Doc. 22 at 15.  Plaintiffs identify the provision that disconnects the No Lapse Guarantee Account from the values and benefits under the Policies as one example of Defendant's misrepresentation.  *Id*.

Plaintiffs' believe they would have needed to retain an accountant annually to parse every word of  the Policies to determine the value in the No-Lapse Guarantee Account, as well as "the ever-changing cost of the Policy's cost of insurance."  *Id*. at 14, 16.  Then, even if they knew the

value of their No-Lapse Guarantee Account (which they did not), they could not know that the value or benefits of the Policies were negatively affected because the Policies expressly state that value does **not** affect the benefits of the Policies.  *Id*.; Doc. 16 ¶ 14.

In addition to the alleged incomprehensibility of those policy terms, Plaintiffs argue the cited provisions suggest that even if Plaintiffs did not pay the stated premium amount (but instead paid only the "cost of insurance") in any given month, the Policies would not lapse if sufficient funds are held in the "No-Lapse Guarantee Account."  Doc. 22 at 7.  Defendant should not have changed the Policies in a substantive way unless Penn Mutual gave Plaintiffs notice of the amount in their No-Lapse Guarantee Account, and Plaintiffs contend the duration of coverage is a substantive provision.  Doc. 22 at 7-8.  If Defendant did not disclose the balance in Plaintiffs' No-Lapse Guarantee Account (which Penn Mutual never did), then Plaintiffs could never know if they were in danger of losing coverage, whether they needed to increase their premium payment to retain coverage, or if they could reduce their payment without risk of losing coverage.  Doc. 22 at 7-8, 20.

Plaintiffs also deny they could glean all relevant policy information from Defendant's website as Penn Mutual has asserted because nothing on the company's website references the duration of coverage or reduction of the same.  Doc. 16 ¶ 15.  Moreover, Defendant utilized policy "Illustrations" to suggest Plaintiffs could build "significant account value," ostensibly likening the Policies to a whole life investment, when in reality, the cash value would be diminished to zero before an insured ever died.  Doc. 16 ¶ 17.  Plaintiffs argue they stand to lose a reduction in coverage *and* cash value in the Policies in a manner that was never explained to them and/or was misrepresented to them at the commencement of the contracts.

According to Plaintiffs, Defendant created an illusion to induce Plaintiffs to purchase the Policies, thinking they were making a whole-life investment, when in effect Plaintiffs received term policies for which Plaintiffs paid premiums well in excess of what term policies cost, rendering Defendant's conduct unconscionable. *Id*. ¶¶ 17-21. Plaintiffs allege that further evidence the Policies are term life policies dressed up to look like whole life policies is also found in the "extremely small type on the last page of Defendant's Illustrations," (*id*. ¶ 21), where it states that after a certain number of years, "the insured may need to increase the amount of the stated premium in order to keep the policy in force." *Id*.

Plaintiffs argue that such lack of notice, combined with the resulting reduction in their duration of coverage, defies good faith and fair dealing, and violates New Mexico's UIPA and UPA by withholding the balance in their No-Lapse Guarantee Account. Doc. 16 ¶ 14. Because Defendant has never told them anything about the No-Lapse Guarantee Requirement being met (or not met), or whether the Policies have lapsed, or are about to lapse, their Policies should not have changed in any way. Plaintiffs make no distinction between the duration in coverage and a Lapse in the Policies.

### III.   <u>Legal Standards</u>

#### A.   <u>Rule 12(c)</u>

Rule 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Rule 12(c) is designed to provide a means of disposing of cases when the material facts are not in dispute. *See Kruzits v. Okuma Mach. Tool, Inc.,* 40 F.3d 52, 54 (3rd Cir. 1994) ("Under Rule 12(c), we will not grant judgment on the pleadings unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.") (internal quotation marks

omitted); *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa.,* 442 F.3d 1239, 1244 (10th

Cir. 2006) *abrogated on other grounds* by *Magnus, Inc. v. Diamond State Ins. Co.*, 545 Fed.

Appx. 750, 753 (10th Cir. 2013) (a "[j]udgment on the pleadings should not be granted 'unless

the moving party has clearly established that no material issue of fact remains to be resolved and

the party is entitled to judgment as a matter of law.' "); *Ramirez v. Wal–Mart Stores, Inc.*, 192

F.R.D. 303, 304 (D.N.M. 2000) ("Any party may move for judgment on the pleadings if no

material facts are in dispute and the dispute can be resolved on both the pleadings and any facts

of which the Court can take judicial notice."); *see generally Selman v. Delta Airlines*, No. CIV

07–1059 JB/WDS 2008 WL 6022017, at *7 (D.N.M. 2008) (thorough discussion of general Rule

12(c) principles).  A Rule 12(c) motion asks the court to render "a judgment on the merits . . . by

looking at the substance of the pleadings and any judicially noted facts." *All. of Artists &*

*Recording Cos., Inc. v. Gen. Motors Co.*, 162 F.Supp.3d 8, 16 (D.D.C. 2016) (internal quotation

marks and citation omitted).

    B.  <u>*The Implied Covenant of Good Faith and Fair Dealing*</u>

      A policy of insurance is a contract "construed by the same principles governing the

interpretation of all contracts."  *Crow v. Capitol Bankers Life Ins. Co*., 891 P.2d 1206, 1210

(N.M. 1995) (citing *Vargas v. Pac. Nat'l Life Assurance Co*., 441 P.2d 50, 53 (N.M. 1968)).

"[U]nder the contract of insurance, there is an implied covenant of fair dealing which creates an

obligation between the parties to act in good faith. New Mexico recognizes this duty of good

faith between insurer and insured."  *Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 690

P.2d 1022, 1024 (N.M. 1984) (internal citation omitted).  "'Broadly stated, the covenant requires

that neither party do anything which will deprive the other of the benefits of the agreement.'"

*Watson Truck & Supply Co., Inc. v. Males*, 801 P.2d 639, 642 (N.M. 1990) (quoting *Romero v.*

*Mervyn's*, 109 N.M. 249, 784 P.2d 992, 1000 (1989) (further citation omitted)).  "Fair dealing is

the obligation to act honestly and in good faith in the performance of the contract."  UJI-1701

NMRA.

Denying a party its rights to benefits of the agreement will breach the duty of good faith

implicit in the contract.  *Wagenseller v. Scottsdale Mem. Hosp.,* 710 P.2d 1025, 1040 (Ariz.

1985) (en banc) (superseded by statute on other grounds as stated in *Powell v. Washburn*, 125

P.3d 373 (Ariz. 2006) (en banc)).  This duty of good faith initially developed "in contract law as

'a kind of safety valve' to which judges may turn to fill gaps and qualify or limit rights and

duties otherwise arising under rules of law and specific contract language."  *Foley v. Interactive*

*Data Corp.,* 765 P.2d 373, 389 (Cal. 1988) (quoting Robert S. Summers, *The General Duty of*

*Good Faith—Its Recognition and Conceptualization,* 67 Cornell L. Rev. 810, 812 (1982)).  "The

implied covenant is aimed at making effective the agreement's promises.  Thus, it is breached

only when a party seeks to prevent the contract's performance or to withhold its benefits from

the other party."  *Azar v. Prudential Ins. Co. of Am.*, 68 P.3d 909, 925 (N.M. Ct. App. 2003).

C.  *The New Mexico Trade Practice Claims:  The UIPA (§ 59A-16-3, 4A and 4G)*
    *and The UPA (§ 57-12-3)*

Both trade practice statutes prohibit the making of any untrue, misleading, or deceptive

statements in connection with the sale of any product.  *See* §§ 57–12–2(D); 59A–16–4; 59A–16–

5.  Under the UIPA, this includes the "fail[ure] to disclose material facts reasonably necessary to

prevent other statements made from being misleading."  Section 59A–16–4(G).  Under the UPA,

this includes "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a

material fact if doing so deceives or tends to deceive."  Section 57–12–2(D)(14); *see also*

*Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 994 (10th Cir. 1999)

(upholding UPA and UIPA claims in retrospective premium case alleging failure to disclose

14

method of whether to add surcharge or raise annual rates). One key difference between the statutes is their respective remedies, which are not relevant to the resolution here.[5] *Bd. of Cty. Commissioners of Sandoval Cty., New Mexico v. First Union Sec.*, No. CIV 01-0120 PK/WWD, 2001 WL 37124858, at *3 (D.N.M. Oct. 19, 2001) ("the UIPA provides primarily administrative enforcement remedies, while the UPA provides "distinct compensatory elements" to the injured person.") (citation omitted).

### *The UIPA*

The New Mexico Legislature passed the UIPA "to regulate trade practices in the insurance business and related businesses," including "practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices." N.M. Stat. Ann.1978, § 59A–16–2. *Est. of Gonzales v. AAA Life Ins. Co.,* No. CIV 11-0486 JB/WDS, 2012 WL 1132332, at *8–9 (D.N.M. Mar. 28, 2012). Plaintiffs bring a claim under subsections 4(A) and 4(G) that prohibit a person from making, publishing, issuing or circulating any estimate, illustration, circular, statement, sales presentation or comparison which (A) misrepresents the benefits, advantages, conditions or terms of any policy, or (G) fails to disclose material facts reasonably necessary to prevent other statements made from being misleading. N.M. Stat. Ann. § 59A-16-4(A) and (G). That statute further prohibits unfair and deceptive acts or practices as follows:

---

[5] The UPA authorizes the attorney general to pursue injunctive relief and restitution to injured persons, in addition to actions for civil penalties for willful violations of the Act. The UPA also authorizes private actions for actual or statutory damages, injunctive relief, and attorney's fees. *State ex rel. Stratton v. Gurley Motor Co.*, 737 P.2d 1180, 1183 (N.M. Ct. App. 1987). The UIPA authorizes the superintendent of insurance to issue cease and desist orders, to suspend or revoke the licenses of insurance companies, to seek injunctive relief in order to preclude improper trade practices, and to initiate actions for imposition of civil penalties for violations of the UIPA. The UIPA, however, does not give the superintendent authority to seek damages or restitution in actions brought by him. *Id*.

> No person shall engage in this state in any practice which in this article is defined or prohibited as, or determined to be, an unfair method of competition, or unfair or deceptive act or practice, or fraudulent.

N.M. Stat. Ann. § 59A-16-3 (1978).

### *The UPA*

The UPA prohibits "unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce . . . ." N.M. Stat. Ann. § 57-12-3. To state a claim under the UPA, a plaintiff must show *inter alia* that any "false or misleading representation [was] 'knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts.'" *Stevenson v. Louis Dreyfus Corp.,* 811 P.2d 1308, 1311 (N.M. 1991); *see also* N.M. Stat. Ann. § 57-12-10. Specifically, a plaintiff "must have sought or acquired goods or services and the defendant must have provided goods or services." *Hicks v. Eller*, 280 P.3d 304, 309 (N.M. App. 2012).

### IV.   Analysis

A.  *The Claim for Breach of the Covenant of Implied Faith and Fair Dealing is Not Precluded by the Lack of a Breach of Contract Claim, but the Claim is Barred by the Express Policy Terms of the Contracts*

**(i)     Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing is not Foreclosed by the Lack of a Breach of Contract Claim**

Defendant argues that Plaintiffs cannot bring a breach of the implied covenant of good faith and fair dealing without a breach of contract claim, relying upon *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1114 (10th Cir. 2005) (a complaining party "cannot decouple [a] claim for breach of the implied covenant of good faith and fair dealing from the contract because the contractual relationship is the only relationship that exists between the parties."). Doc. 21 at 14-15. That Court did not, however, say what Defendant suggests. Instead, *Elliott*

recognized that a breach of the implied covenant cannot override express provisions of a written contract regarding the payment of certain royalties. This Court rejects the suggestion that a breach of the implied covenant of good faith must be asserted alongside a breach of contract claim. *See Dellaira v. Farmers Ins. Exchange*, 102 P.3d 111, 115 (N.M. Ct. App. 2004) (recognizing special relationship between insurer and insured that gives rise to a potential breach of the implied covenant of good faith and fair dealing) (citing *Bourgeous v. Horizon Healthcare Corp.*, 872 P.2d 852, 857 (N.M. 1994)). And besides, to the extent *Elliott* recognizes that the "implied covenant of good faith and fair dealing depends upon the existence of an underlying contractual relationship," *id*. at 1114 (citing *Azar*, 68 P.3d at 925), there was an underlying contractual relationship here between Mr. Lieberman and Penn Mutual.[6]

Nonetheless, that claim must fail because it cannot override express provisions of the contract, as explained below.

### (ii)    The Express Policy Terms Foreclose Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Penn Mutual argues that Plaintiffs may not rely upon a claim for breach of the implied covenant of good faith and fair dealing to override an express provision in the Policies, *i.e.*, the duration of coverage provision, because it ignores the rule applied in *Melnick v. State Farm Mut. Auto. Ins. Co.,* 749 P.2d 1105, 1110 (N.M. 1988). In *Melnick,* New Mexico refused to recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship, determining that it was inappropriate "to apply an implied covenant of good faith and fair dealing to override express provisions addressed by the terms of an integrated, written contract." *Id.* "The general rule is that an implied covenant cannot co-exist

---

[6] Because Defendant challenged Mrs. Lieberman's capacity to sue, the Court makes note of the sufficient contractual relationship between Mr. Lieberman and Penn Mutual only.

with express covenants that specifically cover the same subject matter." *Cont'l Potash, Inc. v. Freeport–McMoran, Inc.,* 858 P.2d 66, 80 (N.M. 1993) ("[T]he trial court erred as a matter of law in finding and enforcing implied covenants against the defendants that were inconsistent with the provisions of the written agreements.").

New Mexico courts hold that the rule in *Melnick* applies to insurance contracts. *Azar v. Prudential Ins. Co. of Am.*, 68 P.3d at 924–25 (refusing to permit the implied covenant of good faith and fair dealing to challenge Prudential's fractional life insurance premium charges where the policies expressly authorized such charges). In *Azar*, life insurance policyholders alleged the insurers failed to disclose additional costs associated with installment payments, *i.e.*, "modal" or "fractional" premiums, instead of once annually. Those plaintiffs argued the insurers had a duty to disclose the dollar amount difference between paying premiums annually, or in installments, as well as the annual percentage rate (APR) charged to policyholders who elected to pay their premiums more frequently than annually. The insurer argued that it disclosed the modal premium charges in a contract clause. *Id*. at 917 (policy language stated that the "more often premiums are due, the larger the total amount that will have to be paid for a contract year").

Like the Plaintiffs here, the *Azar* plaintiffs asked that court to require something different than what the contract provided. Also like the Plaintiffs here, the *Azar* plaintiffs received ten days to review and cancel their policies, and the form of policies had been approved by the New Mexico Insurance Division, and thus was deemed compliant with New Mexico's Insurance Code. *Id*.

The *Azar* court reversed the trial court and held that the rule in *Melnick* barred any claim for breach of the implied covenant of good faith and fair dealing to challenge terms of the policies that expressly authorized the actions about which those plaintiffs had complained. *Id*. at

18

925.  The *Azar* defendant could only breach the implied covenant of good faith if the insurance company sought to prevent the contract's performance or withhold its benefits from the other party.  There was no evidence there that Prudential prevented the contract's performance, which the court said could have occurred if the company affected the amount of premium charged.[7] Prudential also had not impaired plaintiffs' right to a benefit promised by the policy, which the court said could have occurred if the company refused to allow policyholders to change their mode or frequency of payment.  Neither allegation was involved in *Azar*.  Similarly, neither allegation is sufficiently alleged here.

Plaintiffs attempt to distinguish *Azar* because those policyholders did not allege that the company's failure to disclose the difference in costs for installment payments deprived those plaintiffs of a policy benefit, whereas here, Plaintiffs claim that Penn Mutual's non-disclosure (*i.e.*, the failure to disclose the balance in their No-Lapse Guarantee Account and the fact their duration of coverage would be reduced) deprived them of knowing (1) the critical balance amount that would signify whether a lapse was about to occur, and (2) the date upon which and duration of which the policy terms were reduced.  Doc. 22 at 9.

Unlike the *Azar* plaintiffs, the Liebermans claim they sufficiently allege that Penn Mutual impaired a right promised by the Policies, namely a sustained duration of coverage as initially set forth when the Policies commenced.  Yet, the Policies never promise a definitive duration of coverage.  To the contrary, they expressly provide that the "***duration of coverage under this policy will depend on the amount, timing and frequency of premium payments***."  The Policies' Illustrations show that the only thing that will ensure that an insured consistently satisfies the

---

[7] Another example of how an insurer may prevent a contract's performance occurs when the company undertakes to set the premium amount due retrospectively, without disclosing mishandling of claims that have an effect on the insured's premium.  *See Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 976 P.2d 1 (N.M. 1999).

No-Lapse Guarantee Requirement is if the owner annually pays the planned premium outlay, respectively $8754 on Mr. Lieberman's life, and $5196 for Mrs. Lieberman's life. Doc. 9-4 at 9.[8] Plaintiffs received copies of the Policies in advance (with a ten-day review period) of signing, together with various Illustrations that explained how the duration could be impacted by reduced premiums. *See* Doc. 9-1 at 17. Though it is disputed whether and how much the duration of the Policies were reduced (and the parties never state what premium amount Plaintiffs did or did not pay),[9] those uncertain facts do not lead to a different result. The fact remains that the Policies operated precisely as the express terms permitted. Once Mr. Lieberman started making premium payments less than the planned premium outlay, under the express terms of the Policies, he could have requested information from Penn Mutual about how his reduced payments affected the Policies, but he did no such thing, nor do Plaintiffs allege that such information was sought but denied.

Plaintiffs' sub-arguments that they (1) failed to understand how the duration of coverage clause operated, and (2) were entitled to notice before Defendant reduced the duration of coverage, are unavailing.

### Plaintiffs' Failure to Understand the Policies

First, Plaintiffs argue that an insured is not responsible for understanding the intricacies of an insurance contract; however, the cases they rely upon in support thereof are limited to situations where courts were considering whether to apply an insured's constructive knowledge to policy language that was not "plain, clear, and free from all ambiguity" or where the insurer

---

[8] Plaintiffs suggest that the Illustrations offer no guidance here because the Policies expressly state that the Illustrations are not part of the policy contract. Doc. 22 at 4. However, Plaintiffs cite to the Illustrations in their complaint as grounds substantiating Defendant's misrepresentations, and admit that "referring to them in the Motion is clearly fair game." Doc. 16 ¶¶ 16-17, 21, Doc. 22 at 4.

[9] Plaintiffs concede (without offering any details) that in some years they "had only paid the Policies' costs of insurance." Doc. 16 ¶ 11.

committed acts that could have prevented the insured from fully examining the policy. *See, e.g.*, *Pribble*, 501 P.2d at 261 ("We are not prepared to say . . . that the certificate or policy here was 'plain' or 'clear.' . . . [W]e think a situation could arise in which as a reasonable consequence of statements innocently but mistakenly made by one in authority, the insured failed to examine the documents."); *Read v. Western Farm Bureau*, 563 P.2d at 1167 ("A word that an insured cannot understand is a word of doubtful meaning and ambiguous, and if an insured accepts the policy under these facts and circumstances, a genuine issue of material fact exists whether the insured's conduct was that of a reasonable person, such as an ordinary lay person."). Plaintiffs allege the Policies are incomprehensible, but they fail to identify ambiguous terms, nor do they maintain that Penn Mutual's statements or actions led Mr. Lieberman to not review the Policies' terms.

Instead, Mr. Lieberman claims he did not understand the Policies because there was "absolutely no reason" to venture deep into the woods of the Policies to attempt and recognize the misconduct now alleged. Doc. 22 at 16. The law does not relieve Plaintiffs of the Policies' terms, however, just because Mr. Lieberman did not feel the need to fully review them. Mr. Lieberman had more than ample time to review and consider the terms of the Policies. Indeed, both Policies contain a "Free Look Period" that states, "This policy may be cancelled by returning it within 10 days after it is received by the owner . . . This policy will then be considered void as of its inception. Any premium paid on it will be refunded." Doc. 9-1 at 1. Given he made no objection to their terms, Mr. Lieberman accepted the Policies and is deemed to know their terms. *See Pribble*, 501 P.2d at 260 (concluding that insured was bound to make "examination of such documents as would be reasonable for him to do under the circumstances" and is held to that which he would be thereby alerted).

Mr. Lieberman could not reasonably expect his duration of coverage to remain unaffected where the Policies expressly state that the duration of coverage depends on the amount, timing and frequency of payments. In fact, he readily admits that "of course Plaintiffs knew" that a reduction in the amount of the premium paid would reduce the duration of coverage. Doc. 22 at 4-5. Plaintiffs' argument that their failure to understand the policies frees them from the terms and provisions of those policies is simply not supported by the law.

### The Policies' Notification Requirements

Second, Plaintiffs attempt to add a notice provision to the Policies. The Policies had a notice provision which provided that Penn Mutual would provide notice relating to the balance in the No-Lapse Guarantee Account when the Policies were in danger of lapsing. Doc. 9-1 at 8. Thus, notice was only required if the Policies were about to lapse because the Net Cash Surrender Value was insufficient to cover the Monthly deduction for the following policy month, and the No Lapse Guarantee Account (less any outstanding indebtedness) was zero, and thus, the No Lapse Guarantee was unmet. *Id.* at 7-8. While the account calculations are undoubtedly complicated, what's clear, and not at all confusing, is that notice is required prior to any lapse in the Policies, and in conjunction with the grace period of 61 days to keep the Policies in force. Notice was not required for the duration of coverage to be reduced.

There is no allegation that the Policies' notice requirements were triggered, nor that Penn Mutual failed to give the notice required by the Policies, *i.e.*, an impending lapse in coverage. While Plaintiffs make no distinction between a reduced duration of coverage and a lapse in coverage, the Policies clearly do make that distinction; under the Policies, notice is only required when a risk of policy lapse exists, and Plaintiffs do not make that allegation here. Plaintiffs cannot read additional notice provisions into the contracts where they simply do not exist.

The question concerning notice must turn on the express language of the contracts. The Policies unmistakably convey that Defendant will send notice of a potential lapse to the insured at least 30 days before the end of a 61-day grace period that is allowed for payment of any premium necessary to keep the policy in force. Doc. 9-1 at 8. The Policies also anticipate the possibility of a shortened duration of coverage, but there is no notice provision tied to that result. Instead, the Policies state that failure to pay the anticipated premium amount will result in a shortened duration of coverage. Doc. 9-1 at 17.

Plaintiffs chose to reduce their premium payments. Certain consequences and changes necessarily flow from that decision, such as a reduced duration of coverage and foregoing the advantage of building up a significant account value. *See* Doc. 9-4 at 2. Defendant agrees that notice of a lapse would be required if Plaintiffs' reduced payments triggered a lapse in coverage. That notice provision is distinct from Plaintiffs' allegation that Defendant reduced their duration of coverage. The Policies anticipate and permit a reduced duration of coverage without notice. In hindsight, Plaintiffs now seek to attach a notice provision to the reduction in coverage. The Court rejects Plaintiffs' attempt to create a notice requirement where none exists in the Policies.

### An Insurance Company's Fiduciary Duty to the Insured

Plaintiffs also rely upon *R.A. Peck v. Liberty Federal Savings & Loan Assn.*, 766 P.2d 928 (N.M. Ct. App. 1988) to support their position that Defendant breached a fiduciary duty to provide notice of reduced duration of coverage. That case concerned the non-disclosure of information in a bank setting, and it described categories where such a duty to disclose (*i.e.*, to provide notice) arises in the context of claims for fraud and fraudulent or negligent misrepresentation. Recognizing that damages may arise in tort where a party fails to disclose material facts, that court explained that damages may arise for tortious nondisclosure or

concealment in an insurance contract because such disclosure is intrinsically fiduciary and calls for perfect good faith. *See id.* at 932.

From that reasoning, Plaintiffs argue that Penn Mutual had a fiduciary obligation to inform Plaintiffs (1) how to keep their Policies in force, and (2) how to determine the amount of premium the owner wants to pay. Doc. 22 at 10. They cite *Azar* and *Smoot v. Physicians Life Ins. Co.*, 87 P.3d 545 (N.M. Ct. App. 2004) to support that position.

The *Azar* court concluded that "an insurer assumes a fiduciary obligation toward an insured only in matters pertaining to the *performance* of obligations in the insurance contract." *Azar*, 68 P.3d at 926 (emphasis added). Finding no evidence that the insurer breached any fiduciary duty in the performance of its obligations under the insurance policies, the *Azar* court determined that the insurer "did *not* have a fiduciary duty to disclose information relating to modal premium charges before or after the formation of the insurance contracts." *Id.* (emphasis added). *Smoot* reached the same conclusion. *Smoot*, 87 P.3d at 548. The *Smoot* court denied the insureds' claims for breach of covenant of good faith and fair dealing, but permitted UIPA and UPA claims to proceed. Like *Azar*, *Smoot* involved modal premiums, where plaintiffs alleged the insurer failed to disclose additional costs of paying premiums monthly rather than annually. Because a reasonable person reading the *Smoot* policy would know that the more often premiums are paid, the greater the total cost of the premium, the implied covenant of good faith and fair dealing could not override clear contract terms to establish a greater duty to disclose than the contracts allowed. 87 P.3d at 268. The *Smoot* plaintiffs sufficiently alleged a failure to disclose material facts under the UIPA and UPA because disputed facts existed regarding whether the insurer's failure to disclose modal premium charges were material and thus required to be disclosed to prevent misleading the insureds. *Id.*

Plaintiffs argue that *Smoot* is distinguishable because those plaintiffs never alleged they were deprived a benefit of the policies, but that *Smoot* is instructive because it allowed the UIPA and UPA claims to proceed. The Court addresses the UIPA and UPA claims separately below. However, as stated earlier, notification regarding a reduced duration of coverage is not a benefit of the Policies, and thus not a sufficient basis for asserting any claim based on Penn Mutual's fiduciary duties to the Plaintiffs.

Finally, to the extent Plaintiffs attempt to distinguish *Azar* because those plaintiffs never alleged that the insurance company's failure to disclose information deprived them of a policy benefit, the Court finds that distinction unmerited. Plaintiffs reason that Penn Mutual deprived them of knowing the account balance needed for them to determine whether a policy lapse could occur, as well as the date that a reduction in the duration of coverage occurred. Doc. 22 at 9. Yet, the Policies expressly state how to obtain such information from Penn Mutual, and Plaintiffs never allege they did so, nor that Penn Mutual refused to comply with those policy terms.

B.  *Plaintiffs Fail to Allege a Claim Under New Mexico's Trade Practice Act*

(i)      **The UIPA Claim: Plaintiffs Fail to Allege a Misrepresentation**

Plaintiffs identify two provisions of the UIPA to support their claim:  subsection (A), which prohibits anyone from making, publishing, issuing or circulating any estimate, illustration, circular, statement, sales presentation or comparison that misrepresents the benefits, advantages, conditions or terms of any insurance policy; and subsection (G), which prohibits the failure to disclose material facts reasonably necessary to prevent other statements from being misleading. N.M. Stat. Ann. § 59A-16-4(A) and (G).  Plaintiffs allege that by concealing and/or failing to inform them in clear and unambiguous language about the true nature of the Policies (*i.e.*, a term policy vs. a whole life policy) and unilaterally reducing the duration of coverage without notice

to Plaintiffs, Defendant has engaged in unfair and/or deceptive acts and/or practices in violation of the UIPA.  Doc. 16 ¶¶ 22-27.

Defendant seeks dismissal of this claim on two grounds.  First, Defendant argues that Plaintiffs' reference to a violation of § 59A-16-3 is too general to state a claim.  Doc. 21 at 17. Defendant relies on two cases regarding Plaintiffs' lack of specificity.  First, the *Estate of Gonzales*, and next *Yumukoglu v. Provident Life & Acc. Ins. Co.*  In *Estate of Gonzales*, Judge Browning dismissed a UIPA claim based on a violation of the pleading requirement in Fed. R. Civ. P., Rule (8)(a)(2) because plaintiffs failed to provide notice regarding which of the subsections or sections of the UIPA they were asserting against the life insurance company. 2012 WL 1132332, at *17.

Defendant also contends that *Yumukoglu* directs the dismissal of the UIPA claim because there, Judge Black held that Dr. Yumukoglu failed to state which of the fifteen UIPA provisions he relied upon in conjunction with a claim for breach of the implied covenant of good faith and fair dealing; because the breach of the implied covenant claim failed, the UIPA claim also failed. *See Yumukoglu v. Provident Life & Acc. Ins. Co.*, 131 F. Supp. 2d 1215, 1228 (D.N.M. 2001), *aff'd*, 36 F. App'x 378 (10th Cir. 2002).  The crux of Dr. Yumukoglu's argument was that Provident Insurance acted in bad faith when it terminated plaintiff's disability benefits.  *Id*. Judge Black said that Provident's motion for summary judgment was warranted on an insurance bad faith claim because Provident had a reasonable basis for denying that plaintiff's disability where there was credible evidence of the plaintiff's malingering.  *Id*. at 1226.  The UIPA claim was then dismissed in part because only unmerited claims formed the basis of the UIPA allegations.  *Id*. at 1228.  Both the cases Defendant relies upon concerned non-specific UIPA

claims.  Here, however, Plaintiffs have clearly alleged the violation of two specific subsections

of the UIPA, so those arguments are misplaced.

Defendant's second basis for dismissing the UIPA claim is the absence of any actionable

misrepresentation.  Doc. 21 at 17-18.  Penn Mutual contends that Plaintiffs' allegations merely

confirm that Defendant carried out express policy terms, so there is nothing "misrepresented"

that could arise under the UIPA.  Here, the Court agrees.  The lack of an actionable

misrepresentation voids the UIPA claim because Plaintiffs rely only upon express policy terms

as the basis for their misrepresentation.  The Court will not repeat that which is already discussed

*supra*, except to conclude that no colorable misrepresentation is alleged.  The Policies and

Illustrations described how the duration of coverage would be reduced if the Owner decided to

pay less than the planned premium outlay, and that is precisely what occurred here.

    **(ii)**    ***The UPA Claim:  Plaintiffs Fail to Allege (1) a Knowingly False or Misleading Statement, (2) in Connection with the Sale of the Policies, (3) of the Type that May Deceive or Mislead***

The gravamen of a UPA claim is "a misleading, false, or deceptive statement made

knowingly in connection with the sale of goods or services." *Diversey Corp. v. Chem–Source

Corp.,* 965 P.2d 332 (N.M. 1998) (citations omitted).  In order to state a claim under the UPA, a

complaint must contain allegations that: (1) the defendant knowingly made an oral or written

statement, a visual description or a representation of any kind that was either <u>false or misleading</u>,

which the parties agree includes a knowing non-disclosure;[10] (2) the false or misleading

representation was made <u>in connection with the sale</u>, lease, rental, or loan of goods or services in

the regular course of the defendant's business; and (3) the representation was of the <u>type that</u>

---

[10] "[A] failure to disclose must have been a knowing nondisclosure.  A knowing nondisclosure requires an awareness of the nondisclosure."  *Richardson*, 676 P.2d at 1347–48.

<u>may, tends to, or does deceive or mislead</u> any person. *Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091, 1093 (N.M. 2007) (citations omitted).

Penn Mutual challenges each element of Plaintiffs' UPA claim. First, Defendant argues that Plaintiffs fail to allege any false or misleading representation or omission because Plaintiffs only complain about the result of express policy terms. Next, Defendant states that all allegations against Penn Mutual relate only to the company's actions in 2018 and 2019, not <u>at the time</u> or <u>in connection with the sale</u> of the policies in 2011 and 2012. Doc. 21 at 18-19. Finally, because Plaintiffs' allegations concern actions not false or misleading, but instead only those which are expressly stated in the contracts, they are not "of the type" that could possibly deceive or mislead. Success on any one of those grounds would void the UPA claim, and the Court rules in Defendant's favor on each.

<u>Knowingly False or Misleading Omissions</u>

Plaintiffs allege the Policies were misleading under the UPA in two primary ways. First, to the extent the Illustrations explained that an owner may be foregoing the advantage of building up a significant account value if he only paid the premium required to satisfy the No-Lapse Guarantee, that explanation was misleading because it was "designed to give the prospective insured the illusion that by building up a 'significant account value,'" he was in fact building up "cash value," thereby deceiving the insured into believing the contracts were like whole life policies, while actually paying too much for what amounts to term life policies (*see* Doc. 16 ¶¶ 16-17, 20). This argument is grounded in Plaintiffs' contention that the Policies are unconscionable because they will not accrue significant value as Defendant suggested at the onset of the contractual relationship. Once again, however, the pre-sale Illustrations make clear that Plaintiffs' premium payments would impact values under the policy. *See* Doc. 9-4 at 1

("The values in the policy vary based on the amount and timing of the premium payments, the

monthly policy charges, and the credited interest rate. . . . Actual values will vary based on the

timing of these [premium] payments."). The Illustrations further provided that all stated values

were "based on your planned premium outlay" which is expressly stated as $8754 and $5196,

respectively. Doc. 9-4 at 9-10, Doc. 9-5 at 9-10. Plaintiffs fail to identify anything Penn Mutual

has done or failed to do that is inconsistent with the express terms of the Policies. Instead,

Plaintiffs elected to invest less into their Policies, and yielded the very results explained by the

Policies' Illustrations. Such facts cannot substantiate a knowingly false representation or

omission.

Second, Plaintiffs claim the No-Lapse Guarantee provision is false because if an insured

uses his "cash value" in partial payment of the premium (and uses other funds to pay the

difference between the stated premium and the cost of insurance), then the insured inadvertently

reduces his duration of coverage. Doc. 16 ¶ 17. Plaintiffs argue that is misleading because Penn

Mutual recently informed them that if they paid the cost of insurance portion of the premium

with their "cash value," and paid the difference between the stated premium and the cost of

insurance with other funds, it would reduce their duration of coverage. *Id.* ¶ 18. Plaintiffs allege

that in the past, Penn Mutual took a different position on that issue, namely that Penn Mutual

said it would deduct the cost of insurance portion of the planned premium outlay from the

Plaintiffs' cash value, but that Penn Mutual could and would accept those payments with

additional funds to cover the non-cost of insurance portion of the premiums. Because Penn

Mutual did not tell Plaintiffs that changing their planned premium outlay in this way would

impact the duration of coverage, Plaintiffs contend that Penn Mutual misled them in violation of

the UPA. *Id.* According to Plaintiffs, this deception "created an illusion designed to induce the

insureds" to purchase the Policies. *Id*. ¶ 19.  Plaintiffs allege Defendant, therefore, engaged in false, deceptive, and unconscionable practices. *Id*. ¶ 20.  Neither the alleged facts nor case law support Plaintiffs' position.

In *Richardson Ford Sales*, the parties agreed to buy a used pickup truck from Richardson Ford and pay for it through monthly payments. *Richardson Ford Sales, Inc. v. Johnson*, 676 P.2d 1344 (N.M. Ct. App. 1984).  Unable to make their monthly payments, the buyers voluntarily returned the truck to Richardson Ford a year after the sale.  Thereafter, Richardson Ford sold the truck to a third party at a private sale and then sued the prior owners for the unpaid portion of the sales price that remained after crediting the price received at the private sale.  The trial court entered judgment for the amount of the deficiency in Richardson Ford's favor.  The buyers had counterclaimed, seeking relief under the UPA.  The trial court denied relief on the counterclaim, and the buyers appealed. *See Richardson*, 676 P.2d at 1345.

The basis for the buyers' UPA claim was that Richardson Ford's credit representative, who contacted the complaining parties about their payments, did not tell the buyers they could be liable for a deficiency if their pickup truck was returned.  However, the contract at issue expressly provided that if "the money from the sale [after repossession] is not enough to pay off this contract and costs, the Buyer will pay what is still owed to the Creditor, if allowed by law." 676 P.2d at 1346 (finding that liability for a deficiency was allowed by law because it was undisputed that the truck was a consumer good).  The buyers alleged that the company's failure to tell them about a possible deficiency was an unconscionable trade practice or "unfair and deceptive," but the appellate court held that the buyers had been notified about liability for a deficiency based on an express provision in the written contract. *Id*. at 1347-48.  The buyers had also received written notice that referred to liability for a deficiency. *Id*. at 1346.  The

30

*Richardson* buyers failed to provide evidence of any knowing failure to tell them about a potential liability for a deficiency.  Instead, the buyers wrongly assumed they could return the vehicle without consequence.

Similarly, here, Plaintiffs allege that evidence they were misled arises from Defendant's acceptance of their partial premium payment from their insurance Policies' cash value.  Doc. 16 at 18.  Plaintiffs do not allege that Penn Mutual informed them they could their use cash value toward their premium payment with no resulting change in their duration of coverage.  Instead, Plaintiffs allege that Penn Mutual *failed to inform* them that paying their premiums from their cash value would reduce the Policies' durations of coverage.  *Id*.  But the contracts did inform Plaintiffs of that precise result, as already explained *supra*.  *See generally Couch*, 363 F. Supp.3d at 897 (premium flexible policy operated precisely as contemplated where insured had to pay higher premiums to keep the policy in effect).  In *Couch*, that insured failed to allege the insurer took any action that was not permitted by the clear and plain language of the policy.  *Id*. at 903. The same is true here.

Defendant correctly explains that the Policies warned Plaintiffs that failure to pay their planned premium outlay would result in a reduced duration of coverage (and ultimately could cause the Policies to lapse).  Because the Policies forecasted this result, Plaintiffs cannot rely on those facts as the basis for a deceptive, misleading, or unconscionable practice.  *See Richardson*, 676 P.3d at 1348 (A knowing nondisclosure requires an awareness of the nondisclosure.).

Plaintiffs attempt to distinguish *Richardson* on two grounds.  First, life insurance was not at issue in *Richardson*.  Second, information disclosed to the *Richardson* buyers *after* the repossession did not pertain to any disclosures at the time the buyers returned their truck, which Plaintiffs state is their position here.  But *Richardson* is instructive because, like those buyers,

these Plaintiffs received written notice in the applicable Policies that explained how their decision to pay less than the planned premium outlay would result in a reduced duration of coverage.  Plaintiffs admit that somewhere along the way, they decided to pay less than the anticipated planned premium outlay.  Like the buyers in *Richardson*, nobody asked the Plaintiffs to act as they did.  Plaintiffs' view that they would not be subject to a reduced duration of coverage "was no more than an assumption on their part."  *See Richardson*, 676 P.2d 1344 ("The view that [the buyers] would not be subject to a delinquency once the pickup was returned was no more than an assumption on their part; the question of a possible delinquency never came into the conversation with the credit representative.").

The *Richardson* buyers also challenged the company's statements and omissions; however, as to the buyers' allegations about the company's unconscionable practice, the appellate court held that no evidence suggested the representatives had anything to do with the buyers' false assumptions about the deficiency charge.  Nothing suggested the company took advantage of the buyers.  The *Richardson* court discarded the UPA claim in part because it was premised on the operation of a contractual provision that conflicted with the buyers' assumptions at the time of sale.  676 P.2d at 1347-49.  Similarly, here, Plaintiffs' incorrect assumptions at the time of the sale, at the time they decided to reduce their planned premium outlay, and/or when they filed suit do not equate to a knowingly false or misleading omission by Penn Mutual within the meaning of the UPA.

Finally, Defendant points out that any alleged omission fails to be a "knowing" omission because Penn Mutual could have never known at the time of sale how much of a reduced premium amount the Plaintiffs would later choose to pay.  Doc. 21 at 20.  Penn Mutual argues the alleged misrepresentation about the "cash value" is also without merit because the Policies'

values are directly dependent on premium payments that Plaintiffs decided to make, and only

Plaintiffs could have known those amounts, not Defendant.  Doc. 21 at 21.  In other words,

Plaintiffs were in the driver's seat on both those issues.  The Court agrees, and further notes that

the amended complaint also neglects to attach any "knowing" behavior to Penn Mutual's alleged

misconduct.  *See Richardson*, 676 P.2d at 1347-48 (while intent was not an element of the UPA,

knowledge is required).

<u>Defendant's Conduct at the Time or in Connection with the Sale of the Policies</u>

Defendant argues that Plaintiffs' UPA claim fails because they neglect to complain about

Penn Mutual's conduct at the time the parties commenced the contracts, and focus instead upon

actions that occurred years later.  In *Stevenson*, the appellate court overturned a UPA verdict for

a cattle buyer because evidence of any "knowing" action at the time or in connection with the

cattle sale was lacking.[11]  The trial court had permitted a directed verdict against a cattle seller

despite the buyer's failure to present any evidence the cattle seller "knowingly" made false or

misleading statements at the time of the sale.  811 P.2d at 1311.  At trial, Stevenson, the cattle

buyer, relied on caselaw that interpreted the UPA as applying to statements that "not

intentionally unfair or deceptive, could become false or misleading during the life of a

transaction," which the appellate court later rejected.  *Id.*[12] (citation omitted).  Simply failing to

deliver cattle as promised did not arise to a violation of the UPA.  A similar *Stevenson* problem

exists here.  Plaintiffs never allege that Defendant made a "knowing" misrepresentation at the

time Plaintiffs entered into the Policies.  Instead, as repeated throughout this Order, Plaintiffs

---

[11] *Stevenson* recognized that "knowledge" does not necessarily mean "actual knowledge," but means knowledge of such circumstances as would ordinarily lead upon investigation, in the exercise of reasonable diligence which a prudent man ought to exercise, to a knowledge of the actual facts.  *Stevenson*, 811 P.2d at 1311–12.

[12] *Stevenson* did not turn on the timing of the alleged deception; instead, the court recognized that while a "knowing" misrepresentation was required under the UPA, "intention" to misrepresent was not required – an issue not before the Court today

attach fault to the Policies operating as disclosed by their written terms. The Court agrees a UPA claim fails on this second prong as well.

<u>Whether the Alleged Omissions are of the Type that Would Mislead</u>

As to whether the alleged nondisclosure deceived or tended to deceive, the *Richardson* court also considered whether there was evidence of a nondisclosure that deceived or tended to deceive. As explained *supra*, the buyers made the decision to return their pickup truck because they could not make the required payments. The buyers were not asked to turn in the pickup truck. Nor did they ever ask what would happen once the pickup was returned. The buyers' impression that they would not be subject to a delinquency once the pickup was returned was no more than an assumption on their part; the question of a possible delinquency never came into conversation. There was no evidence of a disclosure that deceived or tended to deceive. *Richardson*, 676 P.2d at 1348. The same is true here. Plaintiffs incorrectly assumed they would receive notice of a reduced duration of coverage after they decided to reduce their annual premium payment. The fact that the Policies operated precisely in step with their terms cannot constitute a representation that deceived or tended to deceive the insureds.

The Court recognizes its duty "to broadly read the [amended complaint] and sustain its validity if recovery is available under any state of facts provable under the claim." *Lohman*, 166 P.3d at 1098. However, there is simply no basis upon which to sustain the allegations here because the contracts' express terms foretold the result that occurred. This is a case of *caveat emptor* — let the buyer beware. Respecting the importance of the concomitant principle, "let the seller disclose,"[13] the court nonetheless concludes that Penn Mutual did disclose in writing, via the Policies and Illustrations, exactly what would occur, and what did occur, when the insureds

---

[13] *See Mourning v. Family Publications Serv., Inc*., 411 U.S. 357, 377 (1973)

lowered their planned premium outlay in these Flexible Premium Adjustable Life Insurance Policies. The shortened duration of coverage does not arise to a colorable claim under the legal theories Plaintiffs presented here. Accordingly, Defendant's motion for judgment on the pleadings (Doc. 21) is **GRANTED**.

V.     <u>**Conclusion**</u>

In conclusion, the Court finds that Plaintiffs fail to state a claim for relief that is plausible as a breach of the implied covenant of good faith and fair dealing or a violation of New Mexico's unfair trade practices statutes. Instead, the life insurance policies have operated according to their terms, which understandably, leaves Plaintiffs frustrated with their investments or, perhaps more specifically, their investment decisions. Nonetheless, a reduced duration of coverage resulted from Plaintiffs' decision to reduce their planned premium outlay, a choice outside Defendant's control or knowledge until it occurred, at which time, policy terms dictated consequences of those decisions. The results included a shortened duration of coverage that did not trigger the notice provisions of the Policies. Although notice provisions exist in the Policies, they address a lapse or potential lapse in coverage, neither of which is alleged here.

**IT IS ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE**, and judgment shall enter in Defendant's favor.

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**